**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMID HAFIZI individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALL WEB LEADS, INC., AWL, INC., and AWL INSURANCE AGENCY, INC. d/b/a AUTO QUOTE GUIDE,<br><br>Defendants. | Civil Action No.: 1:26-cv-504<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Umid Hafizi ("Plaintiff") brings this action on behalf of himself and all others similarly situated against All Web Leads, Inc., AWL, Inc. and AWL Insurance Agency, Inc. (collectively, "Defendants"). Plaintiff makes the following allegations based upon personal knowledge as to Plaintiff and Plaintiff's own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's counsel.

## NATURE OF THE ACTION

1. This is a putative class action pursuant to the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, *et seq.* (the "TCPA").

2. Defendants own, operate, and/or work in concert with a car insurance referral service called Auto Quote Guide. Defendants' Website, autoquoteguide.com (the "Website") aggregates car insurance offers and refers persons making inquiries on their website to local car insurance agents.

3. To promote their services, Defendants engaged in sending unsolicited text messages and continued to send text messages to Plaintiff even after he requested that Defendants cease from doing so.

4. Through this action, Plaintiff seeks injunctive relief to halt Defendants' unlawful conduct, which has resulted in the intrusion upon seclusion, invasion of privacy, harassment, aggravation, and disruption of the daily life of Plaintiff and the Class members. Plaintiff also seeks statutory damages on behalf of himself and the members of the Class, and any other available legal or equitable remedies.

## PARTIES

5. Plaintiff Umid Hafizi is a citizen of New York state and a resident of Flushing, New York.

6. Defendant All Web Leads, Inc. is a Texas company with its principal place of business at 9004 Anderson Mill Road, Austin, Texas 78729.

7. Defendant AWL, Inc. is a Texas company with its principal place of business at 9004 Anderson Mill Road, Austin, Texas 78729.

8. Defendant AWL Insurance Agency, Inc. ("AWLIA") is a Texas company with its principal place of business at 9004 Anderson Mill Road, Austin, Texas 78729.

9. On information and belief, Defendants All Web Leads, Inc., AWL, Inc. and AWLIA jointly control, operate, and solicit leads for autoquoteguide.com. At all relevant times, acting alone or in concert with others, Defendants provided automobile insurance lead generator and marketing services, and all products and services pertaining thereto, to consumers in New York and throughout the United States. At all relevant times, acting alone or in concert with others, Defendants formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

10. Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor

of Defendants who has knowingly and willfully aided, abetted, and/or conspired in the unlawful conduct alleged herein.

## JURISDICTION AND VENUE

11. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action arises under the TCPA.

12. This Court has personal jurisdiction over Defendants, and venue is proper in this District, because Defendants direct, market, and provide their business activities to consumers in this District, and because Defendant's text messaging / marketing scheme was directed by Defendant to consumers (including Plaintiff) in this District. Specifically, Defendants directed unsolicited text messages to Plaintiff in this District, where he resides. *See Luna v. Shac, LLC*, 2014 WL 3421514, at *4 (N.D. Cal. July 14, 2014) ("When [Defendant] intentionally sent unsolicited text messages advertising Sapphire to California cell phone numbers, which conduct gave rise to this litigation, it purposefully directed its activity to California such that [Defendant] is reasonably subject to the personal jurisdiction of this Court."); *see also Barton v. Real Innovation Inc.*, 792 F. Supp. 3d 1195, 1204 (W.D. Wash. 2025) ("Plaintiff alleges that the Defendants are subject to jurisdiction in this Court because they directed phone calls to Plaintiff in Washington, where he resides. Numerous courts have held that a telemarketer who makes phone calls into the forum state is subject to specific personal jurisdiction there as to TCPA claims arising from those calls, at least when the phone number is registered in the forum state. … The Court finds that this is sufficient to establish personal jurisdiction at the pleading stage ….") (citations omitted); *accord Ott v. Mortg. Invs. Corp. of Ohio*, 65 F. Supp. 3d 1046, 1057-1059 (D. Or. 2014). Plaintiff also unsuccessfully requested to be removed from Defendants' messaging list from this District. Additionally, Plaintiff's telephone number has an area code, (646), that specifically coincides with locations in this District. *See Barton*, 792 F. Supp. 3d at

1204 ("An area code in the forum state can serve as an indicator to a defendant that they are transacting business in the forum ….").

## FACTUAL ALLEGATIONS

### A. Background on the TCPA

11. Plaintiff brings this case to protect his privacy rights; namely, the right to be left alone from unwanted telemarking communications.

12. Plaintiff brings this suit in an effort to stop companies, like Defendants, from sending text messages to his and putative class members' phones after they had expressly requested that Defendants cease from doing so.

13. When companies, like Defendants, receive a request to stop sending text messages to a recipient of such messages, such companies have an obligation to place the person making the stop request on the company's internal do-not-call list, and to no longer send text messages to the person.

14. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect consumers' privacy rights; namely, the right to be left alone from unwanted telemarketing communications. A leading sponsor of the TCPA described unwanted telemarketing communications as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

15. More specifically, through its enactment of the TCPA, Congress sought to protect consumers from intrusive and unwanted robocalls and text messages that invade privacy and disrupt daily life. *See, e.g.*, *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) ("The TCPA establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent. Congress identified unsolicited contact as a concrete harm, and gave consumers a means to redress this harm. … Congress aimed to curb

telemarketing calls to which consumers did not consent by prohibiting such conduct and creating a statutory scheme giving damages if that prohibition was violated."); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023) ("Congress granted residential phone subscribers the right to create a private line, free from unsolicited calls and intrusive texts."); *accord*; *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1117–18 (9th Cir. 2022); *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1222 (9th Cir. 2022); *see also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016).

16. The TCPA affords special protection for people who request to be placed on a company's internal do not call list. Specifically, the TCPA provides that each person who receives more than one call on their cell phone after requesting to be placed on the company's internal do not call list is entitled to recover a penalty of $500 per call. 47 U.S.C. § 227(c)(5).

17. Under the TCPA's implementing regulations, FCC guidance, and well-settled case law, text messages constitute "calls" within the meaning of the TCPA. *See* 47 C.F.R. § 64.1200(e) ("The rules set forth in paragraph … (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing … text messages to wireless telephone numbers …."); *id.* § 64.1200(a)(9) ("[T]he term 'call' includes a text message, including a short message service (SMS) call."); *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–42 (9th Cir. 2017) ("[T]he Federal Communications Commission (FCC), the agency implementing the TCPA, has interpreted the TCPA to 'encompass[ ] both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls,' which are generally referred to as text messages.") (citing *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd. 14014, 14115 (July 3, 2003)); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' within the compass of [the TCPA].") (citation omitted); *accord Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 874 (9th Cir. 2014); *Satterfield*

*v. Simon & Schuster, Inc.*, 569. F.3d 946, 954 (9th Cir. 2009) (holding that the FCC's interpretation that a text message is a "call" under the TCPA is reasonable). Thus, text messages are calls and are subject to the TCPA.

18. Receiving unwanted telemarketing communications is one that most people, like Plaintiff, frequently deal with. A 2023 tally found that Americans received 415,172,654 spam texts per day that year.[1] Further, New Yorkers received 534,341,450 spam texts during the month of September 2023 alone, making it among the states most targeted by text spammers during that period.[2] Text spammers targeted California more than any other state in September 2023, sending approximately 1,315,688,592 spam texts to Californians during the same time frame.[3] While these 2023 figures are already astronomical, there was a significant increase in overall scam and telemarketing messages sent and received in 2025 as compared to prior years. Indeed, while Americans received a total of approximately 12.4 billion spam texts in September 2023, they received approximately "***19.2 billion spam texts*** in September 2025," which is "nearly ***63 spam texts*** for every person in the U.S."[4] The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission ("FCC") levied more than $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount.[5]

---

[1] *See* Text-Em-All, *2023 Spam Text Statistics: Are Spam Texts On The Rise?* (Oct. 19, 2023) ("*2023 Spam Text Statistics*"), https://www.text-em-all.com/blog/spam-text-statistics.

[2] *See id.*

[3] *See id.*

[4] Robokiller, *How many robotexts are Americans getting?*, https://www.robokiller.com/spam-text-insights (last accessed Oct. 14, 2025) (emphasis in original).

[5] Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790.* Wall Street J. (Mar. 28, 2019) *available* https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

19. These text messages are not only intrusive and harmful to consumers' privacy interests, but they are expensive. Indeed, scam texts cost Americans over $326 million in 2022[6], and those costs have necessarily risen over the last few years, as the number and frequency of spam text messages sent to and received by consumers has increased.

20. To combat this issue, under 47 C.F.R. § 64.1200(d) the TCPA requires that a company implement certain minimum policies and procedures prior to making telemarketing calls, which include texts. These policies and procedures include, in relevant part, maintaining of a written policy, available upon demand, for maintaining a do-not-call list; training personnel engaged in telemarketing; and recording and honoring do-not-call requests when made, as follows:

> (d) No person or entity shall initiate … any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> > (1) ***Written policy.*** Persons or entities making … calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
> >
> > (2) ***Training of personnel.*** Personnel … who are engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
> >
> > (3) ***Recording, disclosure of do-not-call requests.*** If a person or entity making … any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. …
> >
> > (4) ***Identification of callers and telemarketers.*** A person or entity making … any call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a

[6] *See* Text-Em-All, *2023 Spam Text Statistics*, *supra*.

> telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. …
>
> (6) ***Maintenance of do-not-call lists.*** A person or entity making … any call for telemarketing purposes must maintain a record of a consumer's request not to receive further calls. A do-not-call request must be honored for 5 years from the time the request is made.

47 C.F.R. § 64.1200(d)(1)-(4), (6); *see also id.* § 64.1200(e) ("The rules set forth in paragraph … (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing … text messages to wireless telephone numbers ….").

21. Thus, when companies, like Defendants, receive a request to stop sending text messages to a recipient of such messages, they have an obligation to place the person making the stop request on their internal do-not-call list, and to no longer send text messages to the person. *See* 47 C.F.R. § 64.1200(d)(3) and (d)(6).

22. Furthermore, the private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. *See* 47 U.S.C. § 227(c)(5). For example, while the Federal Communications Commission ("FCC") levied more than $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount.[7] Thus, the Congressional goal of deterrence relies heavily on TCPA enforcement by private consumers.

### B. Plaintiff and Class Members Received Numerous Text Messages Despite Requesting Defendants to Stop

23. Defendants operate the lead generation services for car insurance platforms autoquoteguide.com and autoinsurancefree.com. Autoquoteguide.com averages approximately 575,000 monthly visitors.

[7] The Wall Street Journal, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790.* (Mar. 28, 2019), *available at* https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

24. As explained on Autoquoteguide.com, visitors "[f]ill out a secure form," and are then connected "with a licensed insurance agent" who helps them "[s]tart saving money." Frustratingly, however, consumers need not have actually used autoquoteguide.com for Defendants to harass and pester them into using their services.

25. At all times relevant hereto, Plaintiff owned a cell phone, the number for which was (646) XXX-7342.

26. At all times relevant hereto, Plaintiff used the aforementioned cell phone primarily for residential purposes.

27. Plaintiff himself never submitted information to, nor filled out Defendants' "secure form" to be connected to a licensed agent through autoquoteguide.com. Nonetheless, Defendants bombarded Plaintiff with text solicitations to the number ending in 7342 even after Plaintiff requested they stop as recently as September 12, 2025:

//

//

//

//

//

//

//

//

//

//

//

//

//




***Figure 1***

28. The link, with the "topviral" URL, included in the text messages brings Plaintiff to Defendants' autoinsurancefree.com website:




***Figure 2***

29. Although this URL differs slightly from autoquoteguide.com, they contain the same service and with the same trademarks.




30. As demonstrated by the above screenshots, the purpose of Defendants' text messages was to solicit the sale of consumer goods, services, and/or properties and advertise their platform.

31. Defendants did not honor Plaintiff's requests to opt-out of text message solicitations. Indeed, Plaintiff attempted to opt-out of Defendants' text message solicitations by telling Defendants to stop. Defendants continued to send messages to Plaintiff.

32. Defendants' refusal to honor Plaintiff's opt-out requests demonstrates that Defendants have not instituted procedures for maintaining a list of persons who request not to receive text messages from Defendants. The precise details regarding their lack of requisite policies and procedures are solely within Defendants' knowledge and control.

33. Defendants' refusal to honor Plaintiff's opt-out requests demonstrates that Defendants either do not maintain a standalone do-not-call list or—perhaps worse—have one but elect to ignore it entirely. The precise details regarding their lack of training are solely within Defendants' knowledge and control.

34. Defendants do not maintain the required procedures for handling and processing opt-out requests prior to the initiation of the violative text messages they sent to Plaintiff as reflected by the fact that Plaintiff made repeated opt-out requests and those requests were never processed; they were ignored by Defendants and their employees and Defendants continued to send text messages.

35. By failing to immediately record and honor Plaintiff's do-not-call request and continuing to initiate telemarketing telephone solicitations after that request, Defendants failed to honor Plaintiff's do-not-call request "within a reasonable time." *See Lourie v. Papa John's Int'l, Inc.*, No. 1:23-CV-4320-MHC, 2024 U.S. Dist. LEXIS 119679, at *9-10 (N.D. Ga. June 25, 2024) ("Because the Court must accept as true [plaintiff's] allegation that 'Defendant has the capability of immediately complying with Plaintiff's [do-not-call] request,' at this stage of the dispute, the Court must infer that Defendant could have immediately complied with the request prior to the transmittal of the two telemarketing text messages in the week following Lourie's request.") (internal citations omitted).

36. Defendants' failure to honor Plaintiff's do-not-call requests strongly suggests that Defendants also do not meet the other "minimum standards" for the "procedures for maintaining a list of persons who request not to receive" that telemarketers must maintain, such as: (1) a written policy for maintaining an internal do-not-call list, as required by 47 C.F.R. § 64.1200(d)(1); (2) informing and training their personnel engaged in telemarking on the existence and use of any internal do-not-call list, as required by Section 64.1200(d)(2); (3)

"record[ing] the request and plac[ing] the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made," as required by Section 64.1200(d)(3); and (4) maintaining a record of a consumer's request not to receive further texts, as required by Section 64.1200(d)(6).

37. Indeed, it is implausible that Plaintiff would have continued receiving solicitations after a do-not-call request if Defendants had maintained the procedures required by 47 C.F.R. § 64.1200.

38. And certainly, at no point in time after opting out of such text messages by replying "Stop," did Plaintiff provide Defendants with his express written consent to be contacted. Specifically, after opting out of Defendants' text messages, Plaintiff never completed any type of form that clearly and conspicuously authorized Defendants to contact Plaintiff's residential cellular telephone with marketing text messages. *See id.*

39. Thus, to the extent that Defendants *ever* had any consent to contact Plaintiff for marketing purposes, in writing or otherwise, that consent was expressly revoked on at least September 12, 2025, when Plaintiff first responded to Defendants' text message with "Stop." *See* 47 C.F.R. § 64.1200(a)(10) ("A called party may revoke prior express consent, including prior express written consent, to receive calls or text messages made pursuant to paragraphs (a)(1) through (3) … of this section by using any reasonable method to clearly express a desire not to receive further calls or text messages from the caller or sender. Any revocation request made using an automated, interactive voice or key press-activated opt-out mechanism on a call; using the words 'stop[]' … sent in reply to an incoming text message … constitutes a reasonable means per se to revoke consent. If a called party uses any such method to revoke consent, that consent is considered definitively revoked and the caller may not send additional robocalls and

robotexts. … All requests to revoke prior express consent or prior express written consent made in any reasonable manner must be honored within a reasonable time ….").

40. Plaintiff is the regular user of the telephone number that received the above text message solicitations.

41. Plaintiff utilizes the cellular telephone that received Defendants' texts messages for personal purposes. The number is Plaintiff's residential cellular telephone line.

42. As the entities responsible for drafting the language of—and selected recipients for—each text message, Defendants have access to outbound transmission reports for all text messages sent advertising/promoting its services and goods. These reports likely show the dates, times, target telephone numbers, and content of each message sent to Plaintiff and the Class members. Defendants also have access to text message logs showing Plaintiff's and the Class Members' inbound opt-out requests.

43. Defendants' text messages caused Plaintiff and the Class members harm, including statutory damages, inconvenience, invasion of privacy, aggravation, annoyance, and violation of their statutory privacy rights.

**C. Defendants All Web Leads, Inc. and AWL Inc.**

44. Defendant All Web Leads, Inc. is an insurance distribution technology business focused on personal lines in the United States and describes its mission as being "to connect consumers looking for insurance products with licensed insurance agents who can meet their insurance needs."[8]

45. Defendant AWL, Inc. is the common alias of All Web Leads, Inc. and both share the same principal place of business.[9]

---

[8] AWL.com, *available* https://awl.com/.

[9] AWL.com, *About AWL* https://awl.com/about-us/

**D. Defendant AWL Insurance Agency, Inc.**

46. AWLIA is an insurance agency wholly owned and operated by All Web Leads and AWL, "turning calls into written policies for [AWL's] largest carrier customers in property and casualty and health and life verticals."[10]

47. AWLIA describes their agency as "insurance buying made simple."[11]

48. On information and belief AWLIA, along with AWL, jointly controls, operates, and solicit leads for autoquoteguide.com.

## CLASS ALLEGATIONS

49. Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23, on behalf of Plaintiff and all others similarly situated.

50. Plaintiff brings this case on behalf of the Class defined as follows:

> All persons within the United States who, within the four years prior to the filing of this lawsuit, received two or more text messages within any 12-month period, from or on behalf of Defendants, regarding Defendants' goods, services, or properties, to said person's residential cellular telephone number, after communicating to Defendants that they did not wish to receive text messages by replying to the messages by replying with "stop" or similar opt-out instruction to each text message.

51. Plaintiff reserves the right to modify the Class definition as warranted as facts are learned in further investigation and discovery.

52. Excluded from the Class are (1) Defendants, their officers, directors, employees and/or agents; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiff's counsel and Defendants' counsel.

53. ***Numerosity.*** While the exact number of members of the Class is unknown to Plaintiff at this time, and can only be determined by appropriate discovery, upon information and

[10] AWL.com, *About AWL* https://awl.com/about-us/

[11] AWLinsuranceagency.com, *available* https://awlinsuranceagency.com/#contact

belief, the number of members of the Class exceeds 40. Members of the Class may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants and third-party retailers and vendors.

54. ***Existence and Predominance of Common Questions of Law and Fact.*** There are numerous questions of law and fact common to members of the Class which predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a) Whether Defendants sent text messages to Plaintiff and the Class Members;

(b) Whether Defendants continued to send text message solicitations after opt-out requests;

(c) Whether Defendants failed to honor Plaintiff's and the Class Members' opt-out requests;

(d) Whether Defendants maintain an internal do-not-call list and instruct their employees on how to use the list;

(e) Whether Defendants maintain the required policies and procedures under section 64.1200; and

(f) Whether Defendants are liable for damages, and the amount of such damages.

55. The common questions in this case are capable of having common answers, and Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

56. ***Typicality.*** Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories as each member of the Class received Defendants' solicitation text message, replied with "STOP," and continued receiving text messages.

57. ***Adequacy.*** Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the

Class because he has no interests adverse to the interest of the Members of the Class. Plaintiff is committed to the vigorous prosecution of this action, and, to that end, has retained skilled and experienced counsel.

58. ***Superiority.*** A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely substantial, the individual damages incurred by each member of the Class resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

59. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another may not. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

## COUNT I
**Violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d)**
**(On Behalf of Plaintiff and the Class)**

60. Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

61. Plaintiff brings this claim individually and on behalf of the Class against Defendants.

62. In pertinent part, 47 C.F.R. § 64.1200(d) provides:

> (d) No person or entity shall initiate … any call for telemarketing purposes to a residential telephone subscriber

> unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> (1) ***Written policy.*** Persons or entities making … calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2) ***Training of personnel.*** Personnel … who are engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
>
> (3) ***Recording, disclosure of do-not-call requests.*** If a person or entity making … any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. …
>
> (4) ***Identification of callers and telemarketers.*** A person or entity making … any call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. …
>
> (6) ***Maintenance of do-not-call lists.*** A person or entity making … any call for telemarketing purposes must maintain a record of a consumer's request not to receive further calls. A do-not-call request must be honored for 5 years from the time the request is made.

47 C.F.R. § 64.1200(d)(1)-(4), (6); *see also id.* § 64.1200(e) ("The rules set forth in paragraph … (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing … text messages to wireless telephone numbers ….").

63. Defendants are subject to the requirement of Section (d) because it applies to "any

person or entity making telephone solicitations or telemarking calls or text messages to wireless telephone numbers[.]" *Id.* at (e).

64. Defendants continued to send text messages to Plaintiff after his multiple "Stop" requests.

65. 47 C.F.R. § 64.1200(10) provides that "[a] called party may revoke prior express consent … to receive … text messages … by using any reasonable method to clearly express a desire not to receive further … text messages from the … sender." "Any revocation request made … using the words '[s]top,' … sent in reply to an incoming text message … constitutes a reasonable means per se to revoke consent." *Id.* "If a called party uses any such method to revoke consent, that consent is considered definitively revoked and the caller may not send additional robocalls and robotexts. If a reply to an incoming text message uses words other than 'stop,' … the caller must treat that reply text as a valid revocation request if a reasonable person would understand those words to have conveyed a request to revoke consent." *Id.*

66. Plaintiff and the Class Members are residential telephone subscribers who received more than one text message made for purposes of telemarketing or solicitation from Defendants, who has failed to implement the requisite procedures and personnel training as demonstrated by their repeated failure to honor opt-out requests.

67. "Should the text initiator choose to use a texting protocol that does not allow reply texts, it must provide a clear and conspicuous disclosure on each text to the consumer that two-way texting is not available due to technical limitations of the texting protocol, and clearly and conspicuously provide on each text reasonable alternative ways to revoke consent." *Id.* Defendants fail to state that the texting protocol does not allow reply texts.

68. Plaintiff and the Class Members made requests to Defendants not to receive texts from Defendants.

69. Plaintiff and the Class Members revoked any consent they may have provided Defendants by responding with "STOP" or similar opt-out instructions.

70. Plaintiff and Class Members terminated any business relationship they may have previously had with Defendants by replying with a "stop" or similar opt-out instruction in response to Defendant's text messages. *See* 47 C.F.R. § 64.1200(f)(5)(i). (A consumer's "seller-specific do-not-call request … terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.").

71. Defendants continued to send text messages to Plaintiff and the Class Members to harass them into using Defendants' platform.

72. Defendants failed to honor Plaintiff's and the Class Members' opt-out requests.

73. Defendants' refusal to honor opt-out requests is indicative of Defendants' failure to implement a written policy for maintaining a do-not-call list and/or use it.

74. Defendants have not instituted procedures for maintaining a list of persons who requested not to receive telemarketing calls or text messages or otherwise comply with the requirements for maintaining and following such a list.

75. Defendants do not have a written policy, available upon demand, for maintaining a do-not-call list and properly abiding by it.

76. The details and specific facts regarding Defendants' failure to maintain the required policies and procedures, as well as personnel training, are solely within Defendants' knowledge and possession.

77. Defendants have violated 47 C.F.R. § 64.1200(d) by failing to honor opt-out requests, failing to maintain the required policies and procedures, and failing to train their personnel engaged in telemarketing.

78. Pursuant to section 227(c)(5) of the TCPA, Plaintiff and the Class members are entitled to an award of $500.00 in statutory damages for each and every negligent violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following relief:

a) An order certifying this case as a class action pursuant to the Federal Rules of Civil Procedure on behalf of the Class, as defined above, and appointing Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as Class Counsel;

b) An award of statutory and/or treble damages for Plaintiff and each member of the Class as applicable under the TCPA;

c) An order declaring that Defendants' actions, as set out above, violate the TCPA;

d) An injunction requiring Defendants to comply with the TCPA including all applicable regulations; and

f) Such further and other relief as the Court deems necessary.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: January 28, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *_/s/ Philip L. Fraietta_*
Philip L. Fraietta

Philip L. Fraietta
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

Julia K. Venditti*
Joshua B. Glatt*
1990 North California Blvd., 9th Floor

Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: jvenditti@bursor.com
jglatt@bursor.com

*pro hac vice forthcoming*
*Attorneys for Plaintiff*